**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **JACOBY MAIZE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-9393** |
| **STATE OF LOUISIANA** | **SECTION: "J" (5)** |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge to conduct a hearing, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). For the following reasons, **IT IS RECOMMENDED** that the petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

### Procedural History

Petitioner, Jacoby Maize, is a state inmate currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On September 8, 2011, Maize was indicted on seven counts by a Jefferson Parish Grand Jury.[1] On March 4, 2016, he was found guilty as charged by a jury of second-degree murder of Justin Hendricks (count one); aggravated second-degree battery of Cecilia Cruz Maize (count two); two counts of possession of a firearm by a convicted felon (counts three and five); intimidation of a witness, Cecilia Cruz

---

[1] State Rec., Vol. 1 of 13, Grand Jury Indictment.

Maize (count four); aggravated arson (count six); and aggravated assault with a firearm of Cecilia Cruz Maize (count seven).[2]    On March 28, 2016, his motion for a new trial was denied, and he was sentenced on counts one through seven, respectively, to life imprisonment without the benefit of parole, probation or suspension of sentence; 15 years at hard labor; 20 years at hard labor without the benefit of parole, probation or suspension of sentence; 40 years at hard labor; 20 years at hard labor; 20 years at hard labor; and 10 years at hard labor.[3]

Maize appealed the convictions and sentences, raising three counseled assignments of error: (1) the trial court erred in denying his motion to sever counts; (2) the trial court erred in admitting evidence of other crimes; and (3) the trial court erred in denying his motion in limine to exclude the 9-1-1 call made by Justin Hendricks and the hearsay testimony of Andrea Romano.    Maize also filed a *pro se* brief alleging that trial counsel was ineffective for failing to subpoena witnesses for trial, failing to give a closing argument, failing to impeach the testimony of Ms. Rhode, failing to quash the indictment based on Ms. Rhode's testimony, and failing to strike potential jurors during voir dire.    On June 15, 2017, his convictions and six of his seven sentences were affirmed by the Louisiana Fifth Circuit Court of Appeal.[4]    The appellate court vacated his sentence on count seven for excessiveness and remanded for resentencing and correction of the commitment.    On

---

[2]  State Rec., Vol. 3 of 13, Minute Entry, 3/4/16.

[3]  State Rec., Vol. 3 of 13, Minute Entry, 3/28/16.

[4]  *State v. Maize*, 16-KA-575 (La. App. 5th Cir. June 15, 2017), 223 So.3d 633; State Rec., Vol. 4 of 13.    The appellate court referred some of the ineffective-assistance-of-counsel claims to post-conviction relief proceedings.

August 24, 2017, the trial court resentenced Maize on count seven to five years imprisonment.[5]    Maize then filed an application for writ of certiorari with the Louisiana Supreme Court.    On April 27, 2018, the Louisiana Supreme Court denied relief.[6]

Shortly before that decision issued, on March 6, 2018, Maize submitted an application for post-conviction relief to the state district court.[7]    In that application, he raised the following claims for relief: (1) his convictions for two counts of possession of a firearm by a convicted felon violated double-jeopardy principles; (2) the trial court lacked jurisdiction on the second count of being a felon in possession of a firearm; (3) the State suppressed material evidence under *Brady* with respect to prison phone calls; (4) ineffective assistance of trial counsel for failing to provide a defense, object to the second count of felon in possession of a firearm, subpoena an expert witness, recuse himself due to a conflict of interest, and admit a letter from a witness helpful to the defense; (5) prosecutorial misconduct in allowing perjured testimony; and (6) the conviction was unconstitutionally obtained.    On May 9, 2018, the state district court denied relief, disposing of many claims as procedurally barred and denying some on the merits.[8]    On May 25, 2018, the state district court denied Maize's

---

[5]  State Rec., Vol. 4 of 13, Minute Entry, 8/24/17.    A minute entry dated September 21, 2017 reflects the amended commitment as ordered by the appellate court.    State Rec., Vol. 4 of 13.

[6]  *State v. Maize*, 2017-KO-1265 (La. 2018), 241 So.3d 306; State Rec., Vol. 13 of 13.

[7]  State Rec., Vol. 4 of 13, Uniform Application for Post-Conviction Relief.

[8]  State Rec., Vol. 4 of 13, Order denying PCR, 5/9/18.    During this time, he filed several other motions not at issue.    *See generally*, State Rec., Vol. 4 of 13.    His motion entitled habeas corpus was denied on May 9, 2018.    His motion entitled subject matter jurisdiction was also denied on May 9, 2018.    His motion entitled default was denied on May 21, 2018.    He sought supervisory review of the denial of the habeas corpus motion, which was denied on June 13, 2018.    *Maize v. State of Louisiana*, 18-KH-321 (La. App. 5th

objection to the State's response and supplemental post-conviction relief application.[9]    On July 13, 2018, his supervisory writ application filed in the Louisiana Fifth Circuit Court of Appeal was denied for failure to provide the court with the necessary documentation to review his application.[10]    His related supervisory writ application filed with the Louisiana Supreme Court on July 16, 2018, along with a supplement submitted on November 7, 2018, was still pending when he filed his federal application with this Court.[11]

On October 3, 2018, Maize filed his application for federal habeas corpus relief.[12]    He asserted only the three grounds for relief that were considered and fully exhausted in the state courts on direct appeal: (1) the trial court erred in denying his motion to sever counts; (2) the trial court erred in allowing evidence of other crimes; and (3) the trial court erred in denying his motion in limine to exclude the 9-1-1 call made by Justin Hendricks and the hearsay testimony of Andrea Romano.    On January 24, 2019, he filed a motion to stay these

---

Cir. June 13, 2018); State Rec., Vol. 13 of 13.    He filed a subpoena duces tecum request that was denied on August 16, 2018.

[9]  State Rec., Vol. 4 of 13, Order denying Objection to State's Response to Post-Conviction Relief Application and Supplemental Post-Conviction Application.

[10]  State Rec., Vol. 4 of 13, *Maize v. State of Louisiana*, 18-KH-338 (La. App. 5th Cir. July 13, 2018).    The appellate court cited Uniform Rules – Courts of Appeal, Rule 4-5 C, 4-2 and 4-3.    The handwritten application in 18-KH-338 is attached to the supplement filed with the Louisiana Supreme Court in 18-KH-1235 (State Rec., Vol. 13 of 13).

[11]  State Rec., Vol. 13 of 13, Louisiana Supreme Court Writ No. 18-KH-1235.    His supplement clarified that he mistakenly attached the Fifth Circuit ruling from Writ No. 18-KH-321; however, he was challenging Fifth Circuit writ ruling No. 18-KH-338 (and the district court order denying PCR).    As of June 10, 2019, the Clerk's Office of the Louisiana Supreme Court confirmed that the writ application remained pending and no ruling had issued.

[12]  Rec. Doc. 5.

proceedings based on the claims still pending review before the Louisiana Supreme Court.[13] The motion to stay was granted over the State's objection even though it was not a mixed petition.    The order expressly instructed Maize to file a motion to reopen **and** an amended petition raising any additional claims within 30 days of the ruling issued by the Louisiana Supreme Court.[14]

On September 17, 2019, the Louisiana Supreme Court denied relief.[15]    Maize timely filed a motion to lift the stay and the case was reopened.[16]    However, he has never filed an amended petition and the time for doing so has long expired.    Thus, only the three exhausted claims raised initially in his federal application are before the Court on federal habeas review.[17]    The State concedes that the instant application is timely and that the

---

[13] Rec. Doc. 14.

[14] Rec. Doc. 30.

[15] *Maize v. State*, 2018-KH-01235 (La. 2019), 278 So.3d 973.

[16] Rec. Docs. 33, 34.

[17] Maize's request in his "lifting of stay" for an evidentiary hearing on the issue of several phone calls made from prison by Cecilia Cruz, Amanda Boyd and Seth Fortier, which appears connected with a *Brady* claim presented in the state-court PCR proceedings, does not satisfy this Court's explicit order to submit a timely amended petition.    The Court notes that even if the claim had been timely and properly raised, Maize would face a significant procedural obstacle to habeas review because the *Brady* claim was procedurally barred in the state courts.    Furthermore, a review of the state-court record shows that the matter of the JPCC prison calls was vigorously pursued pretrial by the defense and the State turned over the CDs and transcripts of those calls to the trial court for *in camera* review.    *See* State Rec., Vol. 2 of 13, Motion for Access to Records Reviewed in Camera filed in August 2015 (Maize pursued the matter *pro se* in 2012); *see also* State Rec., Vol. 3 of 13, Minute Entry 2/25/16 (trial court noted it found nothing exculpatory in the recorded prison phone calls from JPCC).

three claims for relief were exhausted in the state courts.[18]    Maize has filed a reply to the State's opposition.[19]

### Facts

On direct appeal, the Louisiana Fifth Circuit briefly summarized the facts adduced at trial:

> One day in April 2011, around 4:00 A.M., Henry Linares was traveling with his friend on River Road, when he witnessed a house off of River Road on fire. They stopped, called the police and proceeded to knock on the doors of the houses in the area to alert them to the fire. The same day, in the early morning hours, Tito Guevara–Hernandez was sleeping on his mother's couch when he heard someone screaming. He went to the window and witnessed the house next door on fire.[20] He woke up his mother and sister and they hid in the bathroom when he heard a knock on his front door. They stayed in the bathroom until he saw lights from an emergency vehicle. Mr. Guevara–Hernandez stated he was sitting outside on his front porch the night before the fire when he heard "arguing, fighting" coming from the house next door. He then heard "two shots and somebody ran away." He stated that he hid in the bathroom with his family because he was afraid that someone was knocking on his door the day of the fire because of what he heard on his porch the night prior to the fire.
>
> On April 26, 2011, approximately 4:30 A.M., Detective Anthony Gaudet, an arson investigator with the Louisiana State Fire Marshal's Office, arrived at 112 Maine Street in Jefferson Parish to investigate a fire. He stated that the house was "basically, completely destroyed by the fire." The body of Justin Hendricks was found in the kitchen, with a visible gunshot wound to his pelvis area. The neighbor's home to the right was approximately fifteen to twenty feet away, and because of its close proximity, it also sustained damage from the fire that started at 112 Maine Street.
>
> Detective Gaudet determined that the fire was not accidental or caused by a natural event, and that there was evidence indicative of human intervention in causing the fire. He also determined that there were two points of origin and

---

[18] Rec. Doc. 21.

[19] Rec. Doc. 28.

[20] Mr. Guevara–Hernandez's address is 116 Maine Street.

that gasoline was used as an accelerant. Detective Gaudet further established that the gas meter at 112 Maine Street did not fail, nor was it a source of the fire's origin. He testified that if the fire had reached the gas meter, an explosion would have occurred which potentially could have threatened the life of any of the individuals in the house next door. Investigator Thomas Lowe, an arson investigation supervisor with the Jefferson Parish Fire Department, [21] similarly determined that if the fire had reached the gas meter, the three people in the occupied residence next door "could have been seriously injured" because of a probable explosion. He concluded that the fire was intentionally set, and the fire was classified as an aggravated arson because it spread to the occupied residence next door.

Dr. Susan Garcia, a forensic pathologist with the Jefferson Parish Forensic Center, performed the autopsy of Mr. Hendricks. She testified that he sustained a single, distant-range[22] gunshot wound to his left side, which severed his femoral artery. The gunshot wound was the cause of death and his death was classified as a homicide.[23] She also conducted a carbon monoxide level test to determine if the fire contributed to his death. Dr. Garcia concluded that Mr. Hendricks died before he was exposed to the fire.

Dr. Garcia also testified that Mr. Hendricks had two sharp-force injuries to the ventral surface of his left forearm near his wrist.[24] She determined that these two wounds were made immediately before or after he sustained the gunshot wound. She further explained that wounds on extremities are usually classified as defensive wounds. While she could not say how Mr. Hendricks received those injuries, she stated that the wounds were in a position on his body consistent with defensive wounds.[25]

Detective Rhonda Goff with the Jefferson Parish Sheriff's Office was the supervising detective in the murder investigation of Mr. Hendricks. During the

---

[21] Investigator Lowe was qualified as an expert in the origin and cause of fires.

[22] She explained that gunshot wounds made by guns that are outside of the one to three foot range are considered distant-range wounds.

[23] According to the toxicology report, he had evidence of the consumption of cocaine, amphetamine, and methamphetamine in his system.

[24] She explained that they were incised wounds, or known by its common term, a cut, which are wider than they are deep, as opposed to a stab, which is deeper than it is wide.

[25] David Cox, an expert in forensic DNA analysis, testified that the knife recovered from the crime scene tested positive for blood consistent with Mr. Hendricks.

investigation, she discovered a 9–1–1 call that Mr. Hendricks made on April 25, 2011, at 1:23 A.M. Mr. Hendricks advised the 9–1–1 operator that defendant, Jacoby Maize, was at his home earlier that day and defendant beat his wife, Cecilia Cruz Maize (Ms. Cruz[26]) and struck her with a gun. Defendant and Ms. Cruz subsequently left in a black Land Rover.

On April 29, 2011, defendant and Ms. Cruz were arrested after patrol officers conducted a traffic stop on a black Land Rover. Defendant was initially arrested for an outstanding warrant with the New Orleans Police Department (NOPD) for an aggravated battery by shooting and Ms. Cruz was arrested on a probation violation.

Detective Goff interviewed Ms. Cruz after she was arrested, and Ms. Cruz appeared "beat up." She had a blood-like substance on her clothes, and an "L–type shape" wound on her forehead, "consistent with the butt of a gun striking her on the forehead." As a result of Ms. Cruz's injuries, defendant was "booked" in Jefferson Parish with a felony count of domestic battery.

Ms. Cruz characterized her relationship with defendant as "physical." Defendant beat her "everyday" and "it happened numerous times." He would beat her regardless of who was around and no one ever reported defendant to the police.[27] He used his hands and objects when he beat her. She recalled a specific occasion while she and defendant were living with Amanda Glynn.[28]

---

[26] Cecilia Cruz Maize is referred to throughout the transcript as Ms. Cruz and for consistency purposes she will be referred to hereinafter as Ms. Cruz.

[27] She testified that she stayed with him even though he beat her because she "thought that was love" and she could not "get no better."

[28] Amanda Glynn testified that in January and February 2011, defendant and Ms. Cruz (also referred to as "La–La") lived with her. She stated that defendant and Ms. Cruz had verbal and physical arguments, always initiated by defendant. Their relationship was abusive and defendant would hit Ms. Cruz with "his fists, or objects, or whatever...All the time. At least, every other day." Ms. Cruz never fought back. On one occasion, she witnessed defendant stab Ms. Cruz with a knife and she brought her to the hospital. Defendant picked her up from the hospital. She also saw defendant with a gun that had "some kind of police stamp on" it, while he was living with her. On Easter Sunday 2011, she testified that she was not at home in the morning because she was visiting her daughter in Baton Rouge. After she returned home that evening, no one came to her house that night, overnight, or early in the morning, and she did not drive defendant to Danny and Clyde's or anywhere else. Although she witnessed repeated acts of violence by defendant against Ms. Cruz, she never reported the incidents because she was afraid of defendant.

Defendant stabbed her with a knife, resulting in a hospital visit.[29] She also recalled an incident at Joan Rhode's[30] home that occurred in April 2011 a few weeks before Mr. Hendricks' death, when defendant shot a gun at her. He was angry with her, but she did not remember why he was mad because she stated she did not do anything wrong. Defendant used to make her walk with her head down and she was not allowed to look at other people.

Ms. Cruz met Mr. Hendricks through defendant. In April 2011, she and defendant were living in their vehicle, a black "Range Rover," but it was impounded for lack of insurance. Mr. Hendricks helped her and defendant recover the vehicle by placing the vehicle on his insurance policy so they could retrieve their vehicle. She and defendant were at Mr. Hendricks' home on Easter Sunday, April 24, 2011. However, before they went to Mr. Hendricks' home, she and defendant picked up three of their friends, including Samer Abumusa, in New Orleans. She testified that because of her drug use, she was "asleep" for the entire ride in New Orleans.

On the morning of April 24, 2011, Mr. Abumusa was with defendant in defendant's vehicle. Defendant was driving, Ms. Cruz was in the passenger seat, and he was in the backseat with Tiffany Frey and "Freddy." Mr. Abumusa got into an argument with defendant because Ms. Cruz said "hello" to him. Defendant pulled over and parked the car, turned around and shot Mr. Abumusa. Although he got out of the vehicle and tried to get away from defendant, he was struck by three bullets before he was hit by a truck.[31] Officer Angel Wilson with the NOPD responded to a call of an aggravated

---

[29] Ms. Cruz admitted that she lied to the people at the hospital regarding how she was injured. She did not want to get defendant in trouble and defendant picked her up from the hospital. She thought it was her fault and that she did not deserve better at the time.

[30] Joan Rhode similarly testified that defendant used to beat Ms. Cruz "all the time." She elaborated that he "pistol-whipped" her and "beat her down." Ms. Cruz could not say anything. Ms. Rhode testified that on one occasion at her home, a few weeks prior to Mr. Hendricks death, she heard a gunshot. When she investigated the noise, she observed defendant beating Ms. Cruz in the head with a gun. After defendant and Ms. Cruz left, she went in the house and found a hole in her floor from the gunshot and a shell casing. Ms. Rhode did not report any beatings or the incident with the shooting to the police because she was afraid of defendant. However, the police subsequently collected evidence from the shooting at Ms. Rhode's house during the course of their investigation into Mr. Hendricks' homicide.

[31] Mr. Abumusa also described an incident between defendant and Ms. Cruz that occurred a few weeks before he was shot by defendant. Defendant was arguing with Ms. Cruz and told her to kiss the floor. When she bent over to kiss the floor defendant hit her in the head with a baseball bat. Defendant was angry with Ms. Cruz for speaking to Mr. Abumusa.

battery by shooting on April 24, 2011, at the intersection of Tchoupitoulas and Upperline at approximately 10:30 A.M. involving defendant and Mr. Abumusa. She recovered two casings as well as a copper bullet from the scene.[32]

After the shooting involving Mr. Abumusa, Ms. Cruz and defendant went to Mr. Hendricks' home on the afternoon of April 24, 2011. Ms. Cruz testified that while at Mr. Hendricks' house, they had a physical fight wherein defendant beat her with a lamp, and "with everything that he could find in that house...for, at least, 30, 35 minutes." She cried and screamed and had injuries that bled as a result of the beating. After the fight, they left Mr. Hendricks' home.

Andrea Romano, a friend of Mr. Hendricks, spoke with Mr. Hendricks twice over the phone on Easter, April 24, 2011, in the evening.[33] He told her that a man and woman were in his house earlier and they fought. The man "pistol-whipped" the woman with a gun stamped with "LCPD," which he thought meant Lake Charles Police Department. He also told her that there was blood everywhere. Mr. Hendricks said that they broke a lamp and he was cleaning up the blood while he was talking to her. Out of concern for his safety, Ms. Romano inquired if Mr. Hendricks had a gun. He told her that he did not because he was on probation, but he asked her if she "would feel better if he brought a knife." She told him not to bring a knife to a gun fight. She subsequently spoke with Mr. Hendricks again on the phone and he told her that he was going to see the man later in the day because the man was bringing him money. Mr. Hendricks told her not to worry. Mr. Hendricks subsequently called 9–1–1 and reported the incident that occurred at his house between defendant and Ms. Cruz.

Ms. Cruz testified that she and defendant returned to Mr. Hendricks' house later the same evening to do laundry. However, Mr. Hendricks did not want them at his house. Defendant ordered Ms. Cruz to return to, and remain in, the vehicle. Defendant went in Mr. Hendricks' house. Ms. Cruz heard a gunshot and defendant ran out of the house. When defendant returned to the car, he said, "Justin might be dead" and he mumbled "something about not leaving no evidence." Ms. Cruz stated that she was "hysterical" and started crying. Defendant pulled out a gun and hit her in the head with it, telling her that she "better not saying nothing" and that he would "kill" her little niece and her mother. She did not say anything more. The next night, she and defendant

---

[32] Jene Rauch compared ballistics evidence from the NOPD shooting investigation from April 24, 2011, and the shooting at Ms. Rhode's house and determined that, based on the cartridges recovered in both cases, the same firearm was used.

[33] She explained that she knew Mr. Hendricks for approximately seventeen years at the time of his death and that they spoke frequently.

parked their vehicle on River Road near Mr. Hendricks' house. Defendant got out of the vehicle and retrieved three water jugs full of gasoline from the trunk.[34] When he returned to the vehicle, he no longer had the containers full of gasoline. Ms. Cruz subsequently learned that Mr. Hendricks was dead and that his house had been burned.

Detective Goff established that Mr. Hendricks was killed sometime after he placed the 9–1–1 call at 1:22 A.M. on April 25, 2011, and before the fire became evident the next day, April 26, 2011, around 4:20 A.M. Detective Goff also established that after Mr. Hendricks placed the 9–1–1 call to report defendant beating Ms. Cruz, Mr. Hendricks called defendant at 2:07 A.M. The phone records showed that Mr. Hendricks' and defendant's phones both utilized a phone tower near Mr. Hendricks' house on April 25, 2011, at 2:07 A.M. Moreover, defendant admitted that he spoke with Mr. Hendricks at that time.[35]

After defendant was arrested on April 29, 2011, Detective Goff interviewed him on three different occasions.[36] During the first interview, defendant denied knowing anything about Mr. Hendricks' murder. Detective Goff then played a portion of Mr. Hendricks' 9–1–1 call for defendant. Defendant accused Mr. Hendricks of lying and denied beating Ms. Cruz. In the second interview,[37] defendant stated that he and Ms. Cruz went to Mr. Hendricks' house on Easter but left by 6:00 P.M. After leaving Mr. Hendricks, they went to "Todd's" on Kenner Avenue to fix his car and he spent the night. Detective Goff confirmed Todd's identity, but Todd did not corroborate defendant's statement regarding his whereabouts. Months after his first two statements, Detective

---

[34] She testified that they had stopped at a convenience store and defendant pumped gasoline into the containers prior to going to Mr. Hendricks' house.

[35] Jeff Strohm, a custodian of records for Sprint Corporation, testified that the number associated with defendant's account was (504) 600–0718 and the number associated with Mr. Hendricks' account was (504) 222–1570. The phone records showed that defendant and Mr. Hendricks communicated frequently between Easter Sunday, April 24, 2011, and the following day, April 25, 2011, the day of the murder. After 2:07 A.M. on April 25, 2011, no outgoing calls were made by Mr. Hendricks' phone.

[36] Detective Goff testified that defendant was properly Mirandized before each interview and statement.

[37] Detective Goff testified that at some point during the interview, defendant became very agitated and Sergeant Eddie Klein took over the interview. Sergeant Klein testified that defendant "may have had a problem with women" and he thought defendant would respond to him differently. Defendant calmed down and spoke with Sergeant Klein.

Goff spoke with defendant a third time, at his specific request.[38]  In his third statement, defendant implicated Ms. Cruz in Mr. Hendricks' murder. Defendant stated that Ms. Cruz fought with Mr. Hendricks on Easter, that she returned to Mr. Hendricks' house later in the day and shot him. Defendant also stated that Ms. Cruz set Mr. Hendricks' house on fire after leaving him by the car. During the interview, defendant further admitted having a Glock during the time period in question and that he paid $150.00 for a second gun that Ms. Cruz possessed.  He stated that the second gun was used by Ms. Cruz to murder Mr. Hendricks.[39]

At trial, defendant explicitly denied shooting Mr. Hendricks, setting Mr. Hendricks' house on fire, and hitting Ms. Cruz with a gun. He also denied shooting a gun at Ms. Cruz while at Ms. Rhode's home, denied stabbing Ms. Cruz, and denied shooting Mr. Abumusa. Defendant admitted that he and Ms. Cruz had a fight at Mr. Hendricks house. He stated that he did not hit her with a lamp; the lamp "inadvertently hit her." He pushed her over the coffee table and she landed on the sofa with her hand hitting the lamp, which fell on her. However, in his statement he stated that he "pushed her down on her and the lamp hit her in the top of the head," and he "hit her with the lamp thing." Defendant conceded that he made Ms. Cruz bleed from the injuries he inflicted on her at Mr. Hendricks' house, but argued that he did not beat her with a dangerous weapon. He specifically denied hitting Ms. Cruz with a gun. Defendant further admitted that he and Ms. Cruz got into physical fights, but he stated that she hit him sometimes. Moreover, defendant admitted that he "choked her" and "smacked her," but repeatedly denied that he "beat" Ms. Cruz. Defendant also testified that all of the State's witnesses were lying and that he was the only one being truthful.

Defendant testified that he was asleep at Ms. Cruz's friend Amanda's house when Ms. Cruz called Amanda on the morning of April 25, 2011. Amanda woke him up and brought him to meet Ms. Cruz at Danny and Clyde's on Clearview Parkway at approximately 7:00 A.M. Defendant stated that he and Ms. Cruz rode around and talked. He specifically denied having possession of his cell phone at 4:34 A.M, 4:37 A.M, and 4:49 A.M., on April 25, 2011, when calls were placed from Kenner to Mr. Hendricks. Defendant testified that Ms. Cruz had his phone during those calls and shortly before Mr. Hendricks was murdered.

---

[38]  While the first two statements were not recorded, the third statement was recorded on three separate microcassettes.

[39]  Nikki Passalaqua, a latent print examiner with the Jefferson Parish Sheriff's Office, compared defendant's fingerprints with fingerprints in a certified conviction packet, case number 07–703, wherein defendant pled guilty. She concluded that the fingerprints matched defendant.

However, defendant subsequently stated that after he and Ms. Cruz left Mr. Hendricks' house on Easter, they parked over by Pasadena Avenue in Metairie. While they were parked, his vehicle was approached by patrol officers because of potentially suspicious conduct because the vehicle was parked for a period of time. The police did not find anything after conducting a search of the vehicle and he was not taken into custody. He stated that later that night he went to Amanda's house, took some pills and went to sleep. He testified that it was his sister Amanda's house, not Amanda Glynn's house. His sister was the one who took him to Danny and Clyde's in the morning, not Ms. Glynn.

During his testimony, defendant admitted that he possessed a firearm, a Glock, on April 24, 2011, and on April 25, 2011. He explicitly stated that he carried his firearm "every day," even though he admitted to pleading guilty in January 2009, in case number 07–703, to possession of MDMA, possession with intent to distribute cocaine, and simple possession of marijuana. He stated that because the State admitted it did not have his firearm (the Glock) in its possession, he was not guilty of the two charges of possession of a firearm by a convicted felon on April 24, 2011, and April 25, 2011.

Defendant further testified that Ms. Cruz shot Mr. Hendricks in self-defense. He testified that Ms. Cruz needed a "fix" and realized she left her purse at Mr. Hendricks house on Easter in the afternoon. When she retrieved her purse, she and Mr. Hendricks argued and she shot him in self-defense. Defendant stated he was not present at the time Mr. Hendricks was shot because he was visiting his grandfather at the hospital. Defendant also stated that he was not with Ms. Cruz when she set Mr. Hendricks' house on fire. Defendant admitted that he and Ms. Cruz discussed setting Mr. Hendricks' house on fire, i.e., he gave her advice about where to start the fire—"where the blood is," but testified that it was not his idea. He testified that he "mistakenly" admitted in his third statement that it was his idea to set the fire.[40]

## General Standards of Review

Title 28 U.S.C. § 2254(d)(1) and (2), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides the applicable standards of review for pure questions of fact, pure questions of law, and mixed questions of both. A state court's purely factual determinations are presumed to be correct and a federal court will give deference to

---

[40] *State v. Maize*, 16-KA-575, 223 So.3d at 639-44 (footnotes in original).

the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also* 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). With respect to a state court's determination of pure questions of law or mixed questions of law and fact, a federal court must defer to the decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision is "contrary to" clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the United States Supreme Court's cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of the United States Supreme Court and nevertheless arrives at a result different from United States Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000); *Wooten v. Thaler*, 598 F.3d 215, 218 (5th Cir.), *cert. denied*, 131 S.Ct. 294 (2010). An "unreasonable application" of [United States Supreme Court] precedent occurs when a state court "identifies the correct governing legal rule... but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407-08; *White v. Woodall*, 572 U.S. 415, 426 (2014).

It is well-established that "an unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694.    A state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.    *Puckett v. Epps*, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").    "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable" under the AEDPA.    *Harrington v. Richter*, 562 U.S. 86, 102 (2011).    Section 2254(d) preserves authority to issue the writ in cases where there is "*no possibility* fairminded jurists could disagree that the state court's decision conflicts with [United States Supreme Court] precedents."    *Id*. (emphasis added); *see also Renico v. Lett*, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

## Claims for Relief

### A. Denial of Severance

Maize claims that the trial court erred in denying his motion to sever counts two (aggravated second-degree battery of Ms. Cruz), three (possession of a firearm) and seven (aggravated assault with a firearm of Ms. Cruz).    He argues that these three counts relate to separate incidents involving a different victim, namely Ms. Cruz, and should not have been tried with the counts involving the victim, Mr. Hendricks.    He claims that including these counts at trial served only to prejudice him by characterizing Ms. Cruz as a victim and him as a bad person thereby derailing his defense that it was Ms. Cruz who shot Mr. Hendricks and set fire to his house.    He alleges that the failure to sever the offenses related to Ms. Cruz

rendered the State's proof of identity insufficient, confused the jury and portrayed him as a "wife beater," and thus the implicit perpetrator.    He maintains that "his defense that it was Ms. Cruz who was the true perpetrator was barely heard amidst the allegations of domestic abuse."[41]

On direct appeal, the Louisiana Fifth Circuit rejected this claim noting first that he failed to object to the alleged misjoinder of counts in the indictment through a motion to quash, and thus, any objection to the misjoinder of offenses was waived.    As for the denial of severance, the court of appeal found no abuse of discretion because Maize failed to prove prejudicial joinder.    In denying the claim, the court of appeal reasoned:

> In his first counseled assignment of error, defendant contends that the trial court erred in denying his motion to sever counts two, three, and seven from the other four counts. He argues that counts one, four, five, and six relate to the same incident, while the other three counts relate to separate incidents. Defendant contends that count seven only served to portray him as a "bad guy" and Ms. Cruz as a victim. Defendant alleges that evidence of domestic abuse allegedly committed against Ms. Cruz by him hindered his defensive strategy because he claimed that Ms. Cruz shot Mr. Hendricks and set his house on fire.
>
> Defendant claims that the failure to sever the counts, especially count seven, 1) made the jury more hostile; 2) caused the jury to intertwine the evidence; 3) caused the jury to not hold the State to its burden of proof on all of the other counts charged; and 4) enabled the jury to infer a criminal disposition from the combined counts. Defendant concludes that he was extremely prejudiced by the joinder of offenses and that the jury's verdict cannot be considered unattributable to this error.
>
> The amended indictment charged defendant with the second degree murder of Justin Hendricks, alleged to have occurred on April 25, 2011 (count one); aggravated second degree battery of Cecilia Cruz Maize, alleged to have occurred on April 24, 2011 (count two); two counts of possession of a firearm by a convicted felon, alleged to have occurred on April 24, 2011, and April 25, 2011, respectively (counts three and five); intimidation of a witness, namely Cecilia Cruz Maize, alleged to have occurred on April 25, 2011 (count four);

---

[41] Rec. Doc. 5, p. 11.

aggravated arson of Mr. Hendricks' residence, alleged to have occurred on April 26, 2011 (count six); and aggravated assault with a firearm of Cecilia Cruz Maize, alleged to have occurred in April 2011 (count seven).

Prior to trial, defendant filed a motion to sever the offenses pursuant to La. C.Cr.P. art. 495.1, specifically to sever the counts involving Mr. Hendricks as the victim, from the counts involving Ms. Cruz as the victim.[42] He argued that the charges involving Mr. Hendricks are separate and distinct from the charges involving Ms. Cruz and that the joinder of these offenses would only confuse and prejudice the jury against defendant. The prejudice to defendant would overshadow any consideration of judicial economy. The trial court denied defendant's motion, finding that it was "an appropriate joinder of all of the counts," and if there were any issues concerning a prejudicial effect, it would "handle those issues in instruction to the Jury."

La. C.Cr.P. art. 493 permits the joinder of offenses if the offenses charged "are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan," and the offenses are triable by the same mode of trial.

Felony offenses not triable by the same mode of trial may still be joined in the same bill of information under the conditions specified in La. C.Cr.P. art. 493.2, which provides:

Notwithstanding the provisions of Article 493, offenses in which punishment is necessarily confinement at hard labor may be charged in the same indictment or information with offenses in which the punishment may be confinement at hard labor, provided that the joined offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

While we note that count seven may have been improperly joined in the indictment because it was not based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan as were the remaining counts, this issue was not preserved for appeal. A misjoinder of offenses can only be urged by a motion to quash the indictment. La. C.Cr.P. art. 495. Defendant did not file a motion to quash the indictment on the basis of misjoinder of offenses. Where a defendant fails to file a motion to quash the indictment or information, the defendant is

---

[42] Defendant previously filed a *pro se* motion to sever the offenses, which was denied. That denial is not the basis of this assignment of error.

deemed to have waived any objection to the misjoinder of offenses. *State v. Mallett*, 357 So.2d 1105 (La. 1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 848, 59 L.Ed.2d 41 (1979);[43]  *State v. Robinson*, 11-12 (La. App. 5 Cir. 12/29/11), 87 So.3d 881, 910; *State v. Favors*, 09-413 (La. App. 5 Cir. 11/10/09), 28 So.3d 433, 441. Thus, because defendant failed to file a motion to quash the indictment based on the misjoinder of offenses, we find that he waived any objection to the error under La. C.Cr.P. art. 495. *See also, State v. Collins*, 04-255 (La. App. 5 Cir. 10/12/04), 886 So.2d 1149, *writ denied*, 04-2798 (La. 03/11/05), 896 So.2d 62.

Nevertheless, a defendant may move for a severance of the offenses under La. C.Cr.P. art. 495.1. "If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court *may* order separate trials, grant a severance of offenses, or provide whatever other relief justice requires." La. C.Cr.P. art. 495.1. (Emphasis added.) In this case, defendant filed a motion to sever based on prejudicial joinder of offenses that was denied by the court.

The trial court must consider the following factors in determining whether prejudice results from a joinder of offenses: 1) whether the jury would be confused by the various counts, 2) whether the jury would be able to segregate the various charges and evidence, 3) whether the defendant would be confounded in presenting his various defenses, 4) whether the crimes charged would be used by the jury to infer a criminal disposition, and 5) whether, considering the nature of the charges, the charging of several crimes would make the jury hostile. *State v. Fontenberry*, 09-127 (La. App. 5 Cir. 10/27/09), 27 So.3d 904, 909–910, *writ denied*, 09-2665 (La. 05/28/10), 36 So.3d 246. Additionally, the trial court must consider whether prejudice from the joinder of offenses can be mitigated by clear jury instructions and by an orderly presentation of evidence by the State. *State v. Davis*, 12-512 (La. App. 5 Cir. 04/24/13), 115 So.3d 68, 84, *writ denied*, 13-1205 (La. 11/22/13), 126 So.3d 479.

In its determination of whether charged offenses should be severed for trial, the trial court may consider whether evidence of one offense would have been admissible as other crimes evidence at the trial of the other offense. La. C.E. art. 404 B(1); *State v. Prieur*, 277 So.2d 126 (La. 1973); *State v. Butler*, 08-662

---

[43] The prohibition against misjoinder of offenses and improper consolidation of offenses for trial is grounded on the possible prejudice arising from a single trial on two or more offenses. The defects are not jurisdictional nor do they constitute a denial of due process. Hence, misjoinder of offenses may be waived by the failure to timely assert it by a motion to quash, and improper consolidation of offenses for trial may be waived by the failure to object.

(La. App. 5 Cir. 05/26/09), 15 So.3d 1091, 1102, *writ denied*, 09-1513 (La. 03/05/10), 28 So.3d 1004. However, the fact that evidence of one of the charges would not be admissible under *Prieur* in a separate trial on the joined offense does not, *per se*, prevent the joinder and single trial of both crimes if the joinder is otherwise permissible. *State v. Deruise*, 98-0541 (La. 04/03/01), 802 So.2d 1224, 1232, *cert. denied*, 534 U.S. 926, 122 S.Ct. 283, 151 L.Ed.2d 208 (2001). A close connexity of *res gestae* or integral act evidence is required to insure that the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. *State v. Noten*, 01-1818 (La. 06/25/01), 791 So.2d 607, 608–09 (*per curiam*).

A defendant alleging a prejudicial joinder of offenses has a heavy burden of proof. Motions to sever under La. C.Cr.P. art. 495.1 are within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent an abuse of discretion. Factual, rather than conclusory allegations are required when the defendant alleges prejudicial joinder of offenses on a motion to sever. *Fontenberry*, 27 So.3d at 910. There is no prejudicial effect from joinder of offenses when the evidence of each is relatively simple and distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations. *State v. Butler*, 15-89 (La. App. 5 Cir. 07/29/15), 171 So.3d 1283, 1288, *writ denied*, 15–1608, 207 So.3d 408, 2016 WL 6238013, 2016 La. LEXIS 1868 (La. 10/10/16).

Defendant did not meet his heavy burden of proving prejudicial joinder. The State presented its case in a logical fashion and in such a manner as to keep the evidence pertaining to each count and each victim separate and distinct. Also, the trial court charged the jury separately as to each offense, explaining in detail what the State was required to prove with respect to each count. Further, defendant did not make any specific factual allegations that the joinder of the offenses allowed the jury to infer a criminal disposition or made the jury hostile. Even if the trial court had severed the counts, the evidence regarding the crimes against Ms. Cruz relative to count seven would have been admissible in the murder case, as discussed in more detail in assignment of error two. Moreover, the record lacks any evidence indicating that the jury was hostile or incapable of considering multiple offenses without inferring a criminal disposition. Accordingly, the trial court did not abuse its discretion in denying defendant's motion to sever.[44]

The Louisiana Supreme Court likewise denied relief without citing additional reasons.

---

[44] *State v. Maize*, 223 So.3d at 644-47 (footnotes in original).

It is settled that "[s]everance is within the discretion of the trial court and is required only in cases of compelling prejudice." *Breeland v. Blackburn*, 786 F.2d 1239, 1241 (5th Cir. 1986) (citing *United States v. MacIntosh*, 655 F.2d 80, 84 (5th Cir. 1981)). "The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed by a reviewing court." *Breeland*, 786 F.2d at 1241 (citation omitted). For purposes of habeas review, simultaneous trial of more than one offense must have rendered the state trial fundamentally unfair before a petitioner can obtain federal habeas relief. *Alvarez v. Wainwright*, 607 F.2d 683, 685 (5th Cir. 1979) (quoting *Tribbitt v. Wainwright*, 540 F.2d 840, 841 (5th Cir. 1976)).

Maize's due-process challenge to the denial of his request for a severance presents a mixed question of law and fact for this Court.[45]    *Richardson v. Quarterman*, 537 F.3d 466,

---

[45] Maize appears to concede that the sole federal constitutional issue before this Court is whether the refusal to sever denied him a fair trial. Rec. Doc. 5, p. 9. However, in an abundance of caution, the Court notes that to the extent Maize challenges the trial court's state-law application and analysis of severance principles as erroneous, he has not stated a cognizable federal claim. A federal habeas court does not sit to correct errors made by state courts in interpreting and applying state law. *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011); *Narvaiz v. Johnson*, 134 F.3d 688, 695 (5th Cir. 1998) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990), and *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68; *see also Molo v. Johnson*, 207 F.3d 773, 776 n. 9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law."); *Hogue v. Johnson*, 131 F.3d 466, 506 (1997) (a disagreement as to state law is not cognizable on federal habeas review). Instead, federal habeas courts sit only to address violations of constitutional magnitude, including due process violations that render the criminal proceedings fundamentally unfair. *Lisenba v. People of the St. of Cal.*, 314 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right."). Thus, allegations regarding the state courts' interpretation and application of Louisiana law on severance of offenses, even if erroneous, cannot establish grounds for federal habeas corpus relief.

472 (5th Cir. 2008) (Whether a petitioner's due process rights were violated is a question of law); *Manning v. Warden, Louisiana St. Penitentiary*, 786 F.2d 710, 711-12 (5th Cir. 1986) (failure of state court to sever counts presents a due process question of fundamental fairness on habeas review) (citing *Tifford v. Wainwright*, 588 F.2d 954, 957 (5th Cir. 1979) (denial of motion to sever codefendant's trial from that of other codefendants, under facts of the case, made trial "fundamentally unfair")).   On federal habeas review, this Court must determine if the state court's decision to deny the severance motion was contrary to, or involved an unreasonable application of, Supreme Court precedent concerning petitioner's due process rights.

The appellate court treated the issues separately and found no need to consider if the offenses were mistakenly joined in the indictment.   There was no pretrial ruling to challenge on appeal because Maize did not challenge the indictment on these grounds in a motion to quash.[46]   Any objection under state law to charging all offenses together in the same indictment was waived.   In any event, he did move for severance objecting to joining the seven offenses together for trial.[47]   As for the refusal to sever, the appellate court determined that Maize did not prove he was prejudiced when the trial court allowed the offenses to be tried together.   For purposes of this habeas proceeding, the issue is one of

_____

[46]   State Rec., Vol. 3 of 13, Motion to Quash Indictment.   This counseled motion did not include these grounds and only challenged the second-degree murder charge.

[47]   As mentioned in the direct appeal opinion, only the counseled motion to sever, which was denied after a hearing on January 4, 2016, was before the state courts.   State Rec., Vol. 7 of 13, Motion to Sever; *see also* State Rec., Vol. 9 of 13, Hearing Transcript (1/4/16), pp. 8-14.   The *pro se* motion to sever filed by Maize was also denied at a pretrial hearing held on August 2, 2012.   *See* State Rec., Vol. 8 of 13, Hearing Transcript (8/2/12), p. 38.

fundamental fairness and undue prejudice.

As the court of appeal noted, the amended indictment charged Maize with the second-degree murder of Justin Hendricks, alleged to have occurred on April 25, 2011 (count one); aggravated second-degree battery of Cecilia Cruz Maize, alleged to have occurred on April 24, 2011 (count two); two counts of possession of a firearm by a convicted felon, alleged to have occurred on April 24, 2011, and April 25, 2011, respectively (counts three and five); intimidation of a witness, namely Cecilia Cruz Maize, alleged to have occurred on April 25, 2011 (count four); aggravated arson of Mr. Hendricks' residence, alleged to have occurred on April 26, 2011 (count six); and aggravated assault with a firearm of Cecilia Cruz Maize, alleged to have occurred in April 2011 (count seven). Maize characterizes the crimes as attenuated and unrelated. The defense focused on the different dates and different victims and argued that the offenses should be severed and tried separately to avoid inevitable confusion and prejudice. Specifically, the defense argued that counts two, three and seven occurred at least one day before, and even weeks before—in the case of count seven—the other counts, and that the offenses charged in counts two, three and seven were associated with Ms. Cruz. For this reason, the defense argued that the three offenses should be viewed as separate and distinct from the other four counts surrounding the murder, firearm possession and arson charges associated with Mr. Hendricks.

The trial court twice rejected the severance as unnecessary. In reviewing the ruling, the court of appeal carefully weighed the impact joining the offenses would have on the jury and the ability to present a defense and found that Maize failed to meet the heavy burden of proving prejudicial joinder. In this case, despite the attempt to argue confusion and prejudice by joinder, the seven offenses with interrelated victims all took place in April 2011,

with six of the seven occurring within a two-day window.    The case against defendant included ballistics evidence obtained from the domestic assault incident in early April 2011, which linked the gun in defendant's possession on that date to his possession of the same gun hours before the vicious beating of Ms. Cruz at Mr. Hendricks' house on April 24, 2011 and the murder of Mr. Hendricks by a single gunshot wound on April 25, 2011, and culminated in defendant's threats and violence to keep Ms. Cruz silent and setting fire to Mr. Hendricks' house on April 26, 2011 to cover up the murder.

Maize's overriding concern is that the domestic abuse evidence resulted in confusion and blinded jurors as to his defense that Ms. Cruz was the perpetrator of the murder and arson.    His allegation is not supported by the record.    The facts were not complex.    The evidence was simple and distinct.    The offenses were easily segregated by the jury.    The State presented the evidence in an organized, coherent manner that allowed jurors to distinguish between the different offenses and victims.    The record does not reflect any confusion by jurors.    His allegation that jurors must have inferred he was criminally responsible for the murder and arson simply because he was also tried for assault and battery on his wife is baseless.    There was ample independent and objective evidence upon which to reject the defense that Ms. Cruz, rather than defendant, committed the murder and arson.    Maize has not shown that the failure to sever the three counts was prejudicial or that it prevented him from obtaining a fair trial.    This claim does not warrant habeas relief.

*B. Other Crimes Evidence*

Maize claims that evidence of other crimes was improperly admitted during trial through the testimony of three witnesses: Ms. Glynn, Ms. Rhode and Mr. Abumusa.    On direct appeal, the Louisiana Fifth Circuit considered the claim for relief as to Ms. Glynn and

Ms. Rhode's testimony and denied that claim as procedurally barred, or alternatively, meritless.    First, the court of appeal set forth the general basis for Maize's claims and the applicable law as follows:

> In his second counseled assignment of error, defendant argues that the trial court erred in admitting evidence of other crimes. He claims that the other crimes evidence only served to portray him as a person of bad character. Specifically, he argues the testimony of Ms. Glynn was prejudicial because she testified that defendant sold her heroin and that he possessed and shot a gun at her home weeks before the murder. He also contends the testimony of Ms. Rhode was prejudicial because she testified that defendant sold her heroin and that she witnessed defendant "pistol whip" Ms. Cruz a few weeks before the murder. He argues that because he was not charged with a drug offense, testimony regarding him selling drugs was irrelevant to the charges before the jury and was prejudicial. Further, he claims that neither Ms. Glynn nor Ms. Rhode was a witness to any of the crimes charged, and their testimony only served to show him as a person of bad character.
>
> He also argues that the testimony of Mr. Abumusa was prejudicial because Mr. Abumusa testified defendant shot him and that he witnessed defendant beat Ms. Cruz with a baseball bat. Defendant attacks the credibility of Mr. Abumusa and claims that his testimony was erroneously admitted because it was extremely prejudicial. He further contends that the trial court's "repeated and late granting" of the State's requests to admit other crimes evidence, combined with the joinder of all seven offenses in one trial, made it impossible for defendant to receive a fair trial.
>
> On December 22, 2015, and December 28, 2015, the State filed a 404 B notice and a Supplemental 404 B notice[48] that it would introduce other crimes evidence. The notices referred to Ms. Glynn's statement that defendant sold her heroin and that she observed defendant in possession of a firearm. The State argued that the weapon was consistent with the weapon used to beat Ms. Cruz and the weapon potentially used to murder Mr. Hendricks. The notices also referred to Ms. Rhode's statement that she witnessed defendant "pistol whip" Ms. Cruz after she heard a gunshot. The State claimed that this evidence showed that defendant had the criminal intent to harm Ms. Cruz, motive, opportunity, an absence of mistake or accident, and identity as it related to him being the perpetrator of offenses against Ms. Cruz and the perpetrator of the other charged offenses.

---

[48] The supplemental notice only added exhibits to the motion and did not change it substantively.

On February 12, 2016, the State filed an additional 404 B notice with regard to Mr. Abumusa's statement that defendant shot him hours before the criminal conduct charged in this indictment and that he witnessed defendant beat Ms. Cruz with a baseball bat. The State argued that this evidence served to establish defendant's criminal intent, motive, opportunity, absence of mistake, and identity as the perpetrator of the charged offenses.

Defendant filed objections to all of the State's 404 B notices. Regarding Ms. Glynn and Ms. Rhode, defendant argued that the State should be precluded from introducing this evidence based on the State's untimely notice. Defendant also argued that the State failed to state a legitimate reason why the evidence of other crimes should be admitted at trial. Any probative value the evidence may have would be grossly and substantially outweighed by its prejudicial effect against defendant. As to Mr. Abumusa's testimony, defendant argued that the notice was untimely and that the introduction of this evidence would be prejudicial to him.

At the motion hearing, the trial court: 1) deferred its ruling on the testimony of Ms. Glynn and Ms. Rhode finding that it would need to "make its rulings in the context of the testimony that comes out at trial," 2) denied the objection as to defendant's timeliness argument, and 3) denied the objection as to the testimony of Mr. Abumusa.

Generally, a court may not admit evidence of other crimes to show a defendant is a person of bad character, and that he has acted in conformity with his bad character. *State v. Napoleon*, 12-749 (La. App. 5 Cir. 05/16/13), 119 So.3d 238, 242. However, the State may introduce evidence of other crimes, wrongs, or acts if it establishes an independent and relevant reason for its admissibility, such as to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident. *Id*.; La. C.E. art. 404 B(1). Such evidence is also admissible when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404 B(1).

*Res gestae* events constituting other crimes are deemed admissible because they are so nearly connected to the charged offense that the State could not accurately present its case without reference to them. *Napoleon*, 119 So.3d at 242. Close proximity in time and location is required between the charged offense and the other crimes evidence to insure that the purpose served by admission of other crimes evidence is not to depict defendant as a bad man, or that defendant acted in conformity with the crime, but rather to complete the story of the crime for which he is on trial by proving its immediate context of happenings near in time and place. *Id*.; *State v. Colomb*, 98-2813 (La. 10/01/99), 747 So.2d 1074, 1076. The *res gestae* doctrine is broad and

includes not only spontaneous utterances and declarations made before or after the commission of the crime but also testimony of witnesses and police officers pertaining to what they heard or observed during or after the commission of the crime, if a continuous chain of events is evident under the circumstances. *State v. Taylor*, 01-1638 (La. 01/14/03), 838 So.2d 729, 741, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). The test of whether *res gestae* evidence is admissible is not simply whether the State might somehow structure its case to avoid any mention of the uncharged act or conduct, but whether doing so would deprive its case of narrative momentum and cohesiveness, with power not only to support conclusions, but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict. *Colomb*, 747 So.2d at 1076.

In order for other crimes evidence to be admitted under La. C.E. art. 404 B(1), one of the factors enumerated in the article must be at issue, have some independent relevance, or be an element of the crime charged. *State v. Jackson*, 625 So.2d 146, 149 (La. 1993). Further, the probative value of the extraneous evidence must outweigh its prejudicial effect. La. C.E. art. 403. The defendant bears the burden to show that he was prejudiced by the admission of the other crimes evidence. *State v. Dauzart*, 02-1187 (La. App. 5 Cir. 03/25/03), 844 So.2d 159, 165–66. Absent an abuse of discretion, a trial court's ruling on the admissibility of evidence pursuant to La. C.E. art 404 B(1) will not be disturbed. *State v. Williams*, 02-645, p. 16 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 507, *writ denied*, 02-3182 (La. 04/25/03), 842 So.2d 398.

The appellate court then rejected the claim involving Ms. Glynn's and Ms. Rhode's testimony, both on procedural grounds and on the merits.    The appellate court reasoned:

### **Trial Testimony: Amanda Glynn and Joan Rhode**

Ms. Glynn testified that while defendant and Ms. Cruz were living with her in January and February 2011, she witnessed defendant stab Ms. Cruz with a knife. She also testified that she witnessed repeated acts of physical violence by defendant against Ms. Cruz where defendant would "hit on her" with "his fist, or objects, or whatever." She further testified that she observed defendant with a gun that "had some kind of police stamp on it."

Ms. Rhode testified that she "bought drugs" from defendant and Ms. Cruz. She testified defendant was abusive to Ms. Cruz in that he "beat her all the time" and he "beat her down." She also testified regarding the incident at her house where defendant shot at Ms. Cruz. She heard a gunshot and then witnessed defendant beating Ms. Cruz in the head with a gun. She subsequently gave the police the projectile from the hole in her floor and the shell casing which were found in her house after the incident.

Defense counsel did not object to the testimony of Ms. Glynn or Ms. Rhode at trial. At the pretrial hearing on the 404 B notice, the trial court deferred ruling on the admissibility of the other crimes evidence regarding Ms. Glynn's and Ms. Rhode's testimony until trial. When a defendant does not object to the trial court's failure to rule on a motion prior to trial, the motion is considered waived. *State v. Rivera*, 13-673 (La. App. 5 Cir. 01/31/14), 134 So.3d 61, 66. Further, there is no indication that defendant objected to the lack of a ruling. Therefore, we find that defendant waived any right to raise the issue on appeal regarding the admissibility of the testimony of Ms. Glynn and Ms. Rhode.

Nevertheless, the testimony of Ms. Glynn and Ms. Rhode was properly admitted. Their accounts of defendant perpetrating acts of violence upon Ms. Cruz were relevant to show the volatile nature of the relationship between him and Ms. Cruz, the victim in some of the charged offenses. Additionally, references to defendant's repeated abuse of Ms. Cruz are highly probative of the elements of "intimidate ... by threat of force," charged in count four, by showing that the defendant had the wherewithal to harm Ms. Cruz and her family, as opposed to just making idle threats. *See e.g.*, *State v. Brown*, 95-124 (La. App. 5 Cir. 05/30/95), 656 So.2d 1070, 1075.

Also, accounts of prior domestic violence inflicted upon Ms. Cruz show defendant's control over Ms. Cruz, which repudiates defendant's contention that Ms. Cruz was the true perpetrator of the crimes. *See State v. Altenberger*, 13-2518 (La. 04/11/14), 139 So.3d 510, 516. Furthermore, the brief testimony by Ms. Rhode that she bought drugs from defendant and Ms. Cruz, aided in putting into context her relationship with defendant and helped explain why Ms. Rhode was not the most forthcoming in reporting the crimes she witnessed committed by defendant. Moreover, this brief reference was unlikely to be prejudicial because during his testimony, defendant admitted to having convictions for possession with intent to distribute cocaine, possession of MDMA, and simple possession of marijuana.

Finally, the appellate court rejected the claim involving Mr. Abumusa's testimony:

**Trial Testimony: Samer Abumusa**

Mr. Abumusa testified that he was with defendant on the morning of April 24, 2011. He and defendant got into an argument because Ms. Cruz said "hello" to him, and defendant then shot him. He testified that he was struck by three bullets. He also testified that a few weeks before this incident, he witnessed defendant hit Ms. Cruz in the head with a baseball bat. Defendant told Ms. Cruz to "kiss the floor, and when she bent over to kiss the floor he hit her in the back of the head with a baseball bat."

Evidence of the shooting involving defendant and Mr. Abumusa the morning of April 24, 2011, is admissible *res gestae* evidence. The shooting of Mr. Abumusa began a chain of events that ended with the murder of Mr. Hendricks and Mr. Hendricks' house being set on fire. All of the events and crimes charged in the indictment, except for count seven, occurred over a three-day span. See *Taylor*, *supra*. Moreover, defendant was initially arrested because of the outstanding warrant relating to the shooting of Mr. Abumusa. Also, the gun used in the shooting of Mr. Abumusa was shown to be the same gun used in the shooting involving defendant and Ms. Cruz at Ms. Rhode's house. Further, it was the State's contention that the same gun was used to batter Ms. Cruz and shoot Mr. Hendricks. As to Mr. Abumusa's testimony about defendant hitting Ms. Cruz with a baseball bat earlier in April 2011, that testimony is admissible to show the violent acts defendant inflicted upon Ms. Cruz, a victim in some of the charged offenses and a witness to the other charged offenses.[49]

The Louisiana Supreme Court denied relief without assigning additional reasons.

To the extent Maize implies that the state court erroneously applied state law in admitting "other crimes" evidence at trial, that claim is not cognizable on federal habeas review.    *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).    Habeas corpus review is limited to questions of constitutional dimension, and federal courts generally do not review the admissibility of evidence under state law.    *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *Gonzales v. Thaler*, 643 F.3d 425, 429 (5th Cir. 2011); *Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992).

Federal habeas courts may only review violations of constitutional magnitude, that is, errors that violate due process and render the criminal proceedings fundamentally unfair. *Lisenba v. California*, 314 U.S. 219, 236-37 (1941); *Peters v. Whitley*, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit

---

[49]   *State v. Maize*, 223 So.3d at 647-51 (footnote in original).

constitutional right."). The Due Process Clause provides a mechanism for relief when evidence is wrongly admitted in a state-court criminal proceeding, but only if that evidence is so unduly prejudicial that it renders the trial fundamentally unfair. *Bigby v. Dretke*, 402 F.3d 551, 563 (5th Cir. 2005). Admission of prejudicial evidence is fundamentally unfair and justifies federal habeas corpus relief only if it "played a crucial, critical, and highly significant role in the trial." *Gonzales v. Thaler*, 643 F.3d at 430 (quotation omitted). The evidence must have had a substantial, injurious effect or influence in determining the jury's verdict such that it rendered the trial fundamentally unfair. *Wood v. Quarterman*, 503 F.3d 408, 414 (5th Cir. 2007); *Hernandez v. Dretke*, 125 F. App'x 528, 529 (5th Cir. 2005) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

To the extent Maize alleges that the admission of "other crimes" evidence violated his right to due process, he fails to show the error in admission, *if* one even occurred, contrary to the express holding of the state appellate court, was so extremely prejudicial that it rendered his trial fundamentally unfair.[50] Maize argues that testimony from Ms. Rhode about buying drugs from him and Ms. Cruz, and the testimony from Ms. Rhode and Ms. Glynn about witnessing him beating and stabbing Ms. Cruz on other occasions, prevented him from receiving a fair trial. He also contends that the prejudicial testimony offered by Mr.

---

[50] The State asserts that Maize's federal due-process claim, insofar as Ms. Glynn and Ms. Rhode's alleged objectionable testimony about other crimes, is procedurally defaulted, because the appellate court alternatively held that the claim was not preserved for appeal, and that the claim was meritless, in any event. Arguably, the State is correct. However, as the State concedes (Rec. Doc. 21, p. 19), the court of appeal cited no specific statutory rule in support of the alleged procedural bar. The Court declines to engage in speculation regarding the statutory basis for a procedural bar and will instead address the merits of the claim as reviewed by the state appellate court.

Abumusa that he saw Maize hit Ms. Cruz with a baseball bat and that Maize shot him over an interaction with Ms. Cruz on May 24, 2011, served only to depict him "as a drug dealer shooting off guns and beating his wife."[51]

Even if Maize could show that the testimony was erroneously admitted, which he cannot based on the state appellate court's detailed analysis, he offers nothing to show that the testimony about these incidents was so highly inflammatory and played such a significant role that he was unable to receive a fair trial.    Indeed, the more compelling evidence in this case came from Ms. Cruz herself.    She implicated Maize in the murder and arson, and detailed the lengthy volatile, physically abusive relationship she had with Maize, the specific incidents that occurred, and the power and control he exerted over her because of the abuse.    Her account was supported by the detectives' testimony about the police investigation into the murder and arson after Maize was arrested on an outstanding warrant for an aggravated battery by shooting and charged with domestic battery based on Ms. Cruz's battered condition, and officers learned about a 9-1-1 call from the murder victim, obtained cell phone records and recovered ballistics evidence linking the same gun to two incidents involving Maize.[52]    Maize himself admitted to physical fights with Ms. Cruz in which he smacked, choked and pushed her, but claimed he did not "beat" her.[53]    He admitted he made her bleed at Mr. Hendricks' house, although he offered a different version of how it happened.

---

[51] Rec. Doc. 5, p. 16.

[52] Jene Rauch examined the evidence and concluded that the same firearm was used in the April 24, 2011 shooting of Mr. Abumusa and the shooting incident at Ms. Rhode's house in early April 2011.    State Rec., Vol. 10 of 13, Trial Transcript, 3/3/16, pp. 131-36.

[53] State Rec., Vol. 11 of 13, Trial Transcript, 3/4/16, pp. 36, 46-53.

He disclosed his own numerous drug-related convictions to the jury because he chose to testify.   And the critical testimony about the gun came from Maize himself at trial. Though he tried to shift possession of the gun other witnesses saw him in possession of to Ms. Cruz and although no murder weapon was found, he nonetheless candidly admitted he possessed a Glock firearm when these events occurred throughout April 2011.[54]    There was substantial compelling evidence that Maize was guilty through Ms. Cruz's testimony, which the objective evidence did not contradict, and this alone sufficed to prove his guilt without the "other crimes" evidence.   He cannot show that improper admission of any evidence denied him a fundamentally fair trial.   Maize has not shown that he is entitled to relief on this claim.

### C. Confrontation and Due Process/Admission of Hearsay

Maize claims that his right to confrontation was violated when the trial court improperly admitted the 9-1-1 call made by the murder victim, Mr. Hendricks.   He also contends that he was denied a fair trial when the trial court allowed Andrea Romano to testify about what Mr. Hendricks told her during a telephone conversation.[55]

Regarding the 9-1-1 call, the Louisiana Fifth Circuit denied the claim as procedurally barred under Louisiana Code of Criminal Procedure article 841 (A) ("an irregularity or error

---

[54]  *Id*. at pp. 84-88.

[55]  No specific confrontation argument was made on appeal as to Ms. Romano's testimony.   State Rec., Vol. 11 of 13, Appellant Brief, pp. 19-21.   The appellate court also mentioned that to the extent he was suggesting her testimony constituted testimonial hearsay, the claim was waived because it was not presented in the trial court.   *State v. Maize*, 223 So.3d at 651 n. 26.   Only the due process-fair trial issue is before this Court on habeas review.

cannot be raised on appeal unless an objection was made at the time of the occurrence). The appellate court refused to consider the claim because Maize did not contemporaneously object to the introduction of the evidence at trial and preserve the issue for appellate review.[56]    The Louisiana Supreme Court denied relief without assigning additional reasons. *See Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state-court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).    The State correctly asserts that this claim should be denied as procedurally defaulted.

Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment.    *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)).    This

---

[56]    *State v. Maize*, 223 So.3d at 651 and n. 25.    The defense's motion in limine to exclude the 9-1-1 call based on hearsay was denied pretrial.    State Rec., Vol. 3 of 13, 9-1-1 call transcribed (Hendricks); State Rec., Vol. 3 of 13, Motion in Limine to Exclude Hearsay Evidence (all statements by Justin Hendricks), 12/30/15; State Rec., Vol. 9 of 13, Transcript of Hearing, 1/4/16, pp. 45-46.    The Court was agreeable to allowing defense objections to certain parts for objections such as relevancy, and the state prosecutor asked defense counsel to provide him with the requested excisions.    At trial, certain portions were disputed and excised, but it was then agreed upon and admitted as a joint exhibit without objection.    State Rec., Vol. 10 of 13, Trial Transcript, 3/3/16, pp. 100-01, 116-21.    While it is perhaps subject to interpretation if defense counsel waived the prior objection, as the appellate court expressly found under state law, it is not within the federal habeas court's province to disagree with the application of the bar or to correct state court errors.    *Faciane v. Kent*, Civ. Action 20-809, 2020 WL 6489577, at *7 n. 45 (E.D. La. Oct. 14, 2020), *adopted* 2020 WL 6483112 (E.D. La. Nov. 4, 2020).

"independent and adequate state law" doctrine applies to both substantive and procedural grounds and to federal review of claims that are raised on either direct or habeas review. *Amos*, 61 F.3d at 338.

A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar. *Id.* To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases. *Glover*, 128 F.3d at 902. Here, the state courts expressly relied upon the provisions of Louisiana Code of Criminal Procedure article 841(A). The state-court ruling was based on Louisiana law setting forth the requirements for preservation and presentation of claims on appeal. The ruling was independent of federal law and relied strictly on state procedural requirements.

The statutory grounds cited above qualify as an "adequate" procedural ground because the state rule is "firmly established and regularly followed." *Walker v. Martin*, 562 U.S. 307, 316 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 60 (2009)); *see also Glover v. Cain*, 128 F.3d at 902. State procedural rules enjoy a presumption of adequacy when the state court expressly relies upon them in deciding not to review a claim, and the burden is on the petitioner to demonstrate otherwise. *Glover*, 128 F.3d at 902; *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). It is well-settled that Louisiana's contemporaneous-objection rule is an independent and adequate state procedural ground sufficient to bar federal review of this claim. *Duncan v. Cain*, 278 F.3d 537, 541 (5th Cir. 2002) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)); *Marshall v. Cain*, Civ. Action No. 04-219, 2006 WL 2414073 (E.D. La. Aug. 18, 2006) (Zainey, J.) (Order adopting Report and Recommendation), *aff'd* 247 F. App'x 555 (5th Cir. 2007). The state court's reasons for dismissal of Maize's claim were

therefore independent of federal law and adequate to bar review of his claim in this Court.

In order to overcome the procedural default doctrine, Maize must demonstrate "cause" for the default and prejudice resulting from the default or show that the federal court's failure to review the defaulted claim will result in a fundamental miscarriage of justice.   *Amos v. Scott*, 61 F.3d at 339 (citations omitted).   To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule.   *Murray v. Carrier*, 477 U.S. 478, 488 (1986).   In this case, Maize has not offered any cause for the default which would excuse the procedural bar imposed by the Louisiana courts.   The Court's review of the record does not support a finding that any factor external to the defense prevented him from raising the claims in a procedurally proper manner.   Nor does the record reflect any action or inaction on the part of the State that prevented him from doing so.   "The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice' exception, without regard to whether 'prejudice' is shown."   *Hogue v. Johnson*, 131 F.3d 466, 497 (5th Cir. 1997) (citing *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982).

Finally, to establish a fundamental miscarriage of justice, a petitioner must provide evidence that would support a "colorable showing of factual innocence."   *Murray v. Quarterman*, 243 F. App'x 51, 55 (5th Cir. 2007).   Maize presents no evidence to support a claim of actual innocence that would excuse his procedural default.   Thus, the confrontation claim is procedurally barred from federal habeas review by this Court.

Maize also contends that he was denied due process and a fair trial by the admission of Andrea Romano's hearsay testimony relating Mr. Hendricks' statements about what took place at his house between Maize and Ms. Cruz.   On direct appeal, he asserted that the

admission of this hearsay evidence denied him a fair trial.    The Louisiana Fifth Circuit considered the claim on the merits and denied relief.    The appellate court concluded that the admission of victim Hendricks' statements was properly admitted under the excited utterance exception to the rule excluding hearsay, and, even if admitted in error, the admission was cumulative of other testimony and thus harmless.    In rejecting the claim, the appellate court reasoned:

### Conversation with Andrea Romano

On December 30, 2015, defendant filed a motion in limine, arguing that any testimonial evidence from Andrea Romano alluding to conversations she had with Justin Hendricks should be excluded as hearsay and if permitted would be prejudicial. [57] The State contended that the hearsay testimony of Ms. Romano would be subject to the excited utterance exception. The trial court deferred ruling on Ms. Romano's testimony until trial.

At trial, before testimony from Ms. Romano was elicited, defense counsel objected based on the hearsay nature of the statements and moved for a hearing pursuant to La. C.E. art. 104(a) [58] to determine the admissibility of the

---

[57] To the extent that defendant argues Ms. Romano's testimony constitutes testimonial hearsay on appeal, this issue is waived because it was not presented to the trial court.

[58] La. C.E. art. 104 provides:

A. Questions of admissibility generally.—Preliminary questions concerning the competency or qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of Paragraph B. In making its determination it is not bound by the rules of evidence except those with respect to privileges.

B. Relevancy conditioned on fact.—Subject to other provisions of this Code, when the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

C. Hearing of jury.—Hearings on matters to be decided by the judge alone shall be conducted out of the hearing of the jury when the interests of justice require. Hearings on the admissibility of confessions or admissions by the accused or evidence allegedly

evidence. Outside the presence of the jury, Ms. Romano testified that she regularly spoke with Mr. Hendricks in the months leading up to his death. When she spoke with him the first time on April 24, 2011, he was "agitated and excited," and she could "tell he was moving around and his conversation was kind of all over the place." Mr. Hendricks was "speaking quickly" and would "tell one part of the story here, and then jump to something else, and then come back to this part of the story." She categorized his behavior as out of the ordinary. He was "speaking more loudly than usual and more choppy than usual" and she felt based on all of these behaviors that he was "panicky and agitated." During this first conversation,[59] Mr. Hendricks related that a couple was at his house earlier, they had a fight, the man "pistol-whipped" the woman, the man owed him money, and that he was going to meet the man later that evening. Mr. Hendricks stated that he was cleaning up the blood from the incident while he was on the phone.

Because he was cleaning up blood from the fight, the State argued that Mr. Hendricks actions "would indicate that it's an ongoing event" and Mr. Hendricks "evidenced an intent to meet the defendant thereafter." The State offered Ms. Romano's testimony as exceptions to the hearsay rule, namely an excited utterance and as a statement regarding then existing state of mind. Defense counsel objected and argued that the contents of the call constituted hearsay because Ms. Romano could not provide a time for when the events Mr. Hendricks described unfolded. The court overruled defendant's objection to Ms. Romano's testimony.

Hearsay is an out-of-court statement, other than one made by the witness, offered to prove the truth of the matter asserted in the statement. La. C.E. art. 801C. Hearsay evidence is generally inadmissible unless otherwise provided

---

unlawfully obtained shall in all cases be conducted out of the hearing of the jury, but when there has been a ruling prior to trial, it shall not be necessary to conduct another hearing as to admissibility before presentation of the evidence to a jury.

D. Weight and credibility.—The preliminary determination by the court that evidence is admissible does not limit the right of a party to introduce evidence relevant to weight or credibility at the trial.

[59] Ms. Romano also had a second conversation with Mr. Hendricks; however, the objection to this conversation was withdrawn by defense counsel based on the trial court's admission of the first statement. The State said it would forego its argument on the admissibility of the second statement based on the defendant wanting the second statement in based on the admission of the first conversation by the trial court. The State noted that "any issue that's reviewed later should be limited to whether or not that first statement is properly admitted." Thus, the second conversation is not before this Court on appeal.

by the Code of Evidence or other legislation. La. C.E. art. 802. An excited utterance is an exception to the hearsay rule. It is defined as "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." La. C.E. art. 803(2). Two requirements must be met for the excited utterance exception to apply: (1) there must have been an event sufficiently startling to render a declarant's normal reflective thought process inoperative, and (2) the statement must have been a spontaneous reaction to the event and not the result of reflective thought. *State v. Henderson*, 362 So.2d 1358, 1362 (La. 1978); *State v. Ramirez*, 09-350 (La. App. 5 Cir. 12/29/09), 30 So.3d 833, 844; *State v. Hester*, 99-426, p. 14 (La. App. 5 Cir. 09/28/99), 746 So.2d 95, 106, *writ denied by State v. Patterson*, 99-3217 (La. 04/20/00), 760 So.2d 342.

The most important factor in determining whether a statement was made under the stress of a startling event is time. *Id.* Other factors include whether the statement is self-serving or in response to an inquiry, whether the statement expands beyond a description of events to include past or future facts, and " 'whether the interval between the event and the statement was long enough to permit a subsidence of emotional upset and a restoration of a reflective thought process.' " *State v. Ramirez*, 09-350 (La. App. 5 Cir. 12/29/09), 30 So.3d 833, 844, (quoting *State v. Hilton*, 99-1239 (La. App. 1 Cir. 03/31/00), 764 So.2d 1027, 1035, *writ denied*, 00-958 (La. 03/09/01), 786 So.2d 113). A trial judge's determination regarding admissibility of evidence will not be overturned on appeal absent a clear abuse of the trial judge's discretion. *State v. Odoms*, 01-1033 (La. App. 5 Cir. 03/26/02), 815 So.2d 224, 230–31, *writ denied*, 02-1185 (La. 11/22/02), 829 So.2d 1037.

The trial court did not abuse its discretion in admitting Ms. Romano's testimony. During her testimony, Ms. Romano stated that Mr. Hendricks told her that a man and woman had a fight at his home earlier that day, April 24, 2011. He stated that the man "pistol-whipped" the woman and there was "blood everywhere." Although it is unclear how long after the fight between defendant and Ms. Cruz that Mr. Hendricks' spoke with Ms. Romano, Mr. Hendricks stated that he was cleaning up blood from the incident while he was on the phone with her.[60] Ms. Romano described Mr. Hendricks demeanor as out of the ordinary because he was agitated and excited, and spoke in a disjointed manner. Mr. Hendricks' statements to Ms. Romano were not self-serving or made in response to an inquiry, and were in close proximity to the fight such that Mr. Hendricks was still upset about it when he spoke to Ms.

---

[60] Also, Mr. Hendricks' phone records indicated that this conversation with Ms. Romano began at 7:01 P.M. and that communications between Mr. Hendricks and defendant did not occur between 3:00 P.M. and 6:30 P.M., which would be consistent with defendant and Mr. Hendricks being together during that time.

Romano. Therefore, Mr. Hendricks' statements were properly admitted under the excited utterance exception to the hearsay rule.

However, even assuming these statements did not qualify as excited utterances, and were inadmissible hearsay, the admission of hearsay testimony is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial. *State v. Williams*, 09-48 (La. App. 5 Cir. 01/27/09), 28 So.3d 357, 367, *writ denied*, 09-2565 (La. 05/7/10), 34 So.3d 860 (citing *State v. Johnson*, 389 So.2d 1302 (La. 1980)). Ms. Cruz testified that she was at Mr. Hendricks' home on April 24, 2011, and that defendant beat her, but she could not remember if he hit her with a gun. However, Detective Goff testified that when Ms. Cruz was arrested, she had an "L–type shape" wound on her forehead which was "consistent with being pistol whipped." Additionally, defendant conceded that he made Ms. Cruz bleed from the injuries he inflicted on her at Mr. Hendricks' house. Thus, Ms. Romano's testimony appears to be cumulative. Based on the foregoing, if the statements were improperly admitted, it was harmless error.[61]

The Louisiana Supreme Court denied relief without assigning additional reasons.

As an initial matter, as the State correctly argues, to the extent Maize asserts the trial court erred in applying the "excited utterance" exception to admit hearsay, that purely state-law claim is not cognizable on federal habeas review.   As previously noted, federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States—mere violations of state law will not suffice.   28 U.S.C. § 2254; *Engle v. Isaac*, 456 U.S. 107, 119 (1983).   A federal habeas court's review extends only to violations of constitutional magnitude such as due process violations that render the criminal proceedings fundamentally unfair.   *Lisenba*, 314 U.S. at 236-37; *Peters v. Whitley*, 942 F.2d at 940 (Habeas corpus review is proper only to determine whether a state trial judge's error is so extreme as "to render the trial fundamentally unfair or violate an explicit constitutional right.").

---

[61]  *State v. Maize*, 223 So.3d at 651-54 (footnotes in original).

Maize's federal constitutional claim that the admission of Ms. Romano's testimony violated his right to due process and a fair trial also fails.    Ms. Romano related that Mr. Hendricks was in an excited and agitated state when he told her he was cleaning blood from earlier when a couple was at his house and the man pistol-whipped the woman with a gun he described to Ms. Romano, and that the man owed him money and he planned to meet the man later that evening.[62]    The statements were admitted as an excited utterance, and that ruling was upheld on appeal.    On the record presented, the state appellate court also found that any error in admission was harmless because the evidence was cumulative.

Ms. Romano's testimony about what Mr. Hendricks told her on the phone concerning his interactions with Maize and Ms. Cruz was largely cumulative of other evidence admitted at trial, as detailed by the court of appeal, regarding the physical fight at Mr. Hendricks' house that day.    Moreover, the critical evidence that resulted in Maize's conviction for Mr. Hendricks' murder and arson was undoubtedly Ms. Cruz's damaging testimony at trial as to Maize beating her at Hendricks' house, later shooting Hendricks, and then returning with jugs full of gasoline to burn the scene of the crime, along with Maize's implausible trial testimony—offered against the advice of counsel—by which he tried to disavow previously admitting that it was his idea to set the fire and attempted unsuccessfully to dispute Ms. Cruz's version of the events, which was supported by the evidence.[63]    Therefore, even if the state court had erred in allowing into evidence hearsay statements Mr. Hendricks made to

---

[62]    State Rec., Vol. 10 of 13, Trial Transcript, 3/3/16 (Romano), pp. 104-05.

[63]    State Rec., Vol. 10 of 13, Trial Transcript, 3/3/16 (Cruz), pp. 159-169; Vol. 11, Trial Transcript, 3/4/16 (Maize), pp. 20-103.

Ms. Romano, the admission of such evidence did not render his trial fundamentally unfair and violate due process. The state-court determination was neither contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. Accordingly, Maize's due-process claim should be denied.

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is **RECOMMENDED** that Maize's application for federal habeas corpus relief be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[64]

New Orleans, Louisiana, this __18th__ day of _____ March _____, 2021.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**

---

[64] *Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.